## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

-----------------------------------------------------------------x

IN RE:                                          )
                                                )
BARTMANN, WILLIAM R.                            )       Case No. 03-04975-R
and BARTMANN, KATHRYN A.                        )       (Chapter 7)
                                                )
           Debtors.                             )
                                                )
MPF LIMITED, PEGASUS TWO                        )
LIMITED, PEGASUS THREE LIMITED,                 )
PEGASUS FOUR LIMITED, IOWA STATE                )
UNIVERSITY FOUNDATION, ALLIANCE                 )
CAPITAL (LUXEMBOURG) S.A.,                       )
MANSURII DORIIMU, and MANSURII                  )
DORIIMU II,                                     )
                                                )
           Plaintiffs,                          )       **03-0248 -R**
                                                )
vs.                                             )       Adv. Pro. No. _____
                                                )
WILLIAM R. BARTMANN and KATHRYN                 )
A. BARTMANN,                                    )
                                                )
           Defendants.                          )

-----------------------------------------------------------------x

## COMPLAINT FOR DETERMINATION OF
## NON-DISCHARGEABILITY OF DEBT

Plaintiffs MPF Limited, Pegasus Two Limited, Pegasus Three Limited,

Pegasus Four Limited, Iowa State University Foundation, Alliance Capital (Luxembourg)

S.A., Mansurii Doriimu, and Mansurii Doriimu, II (collectively, the "Plaintiffs"),

creditors in this bankruptcy proceeding, for their complaint against William R. Bartmann

("Bartmann") and Kathryn A. Bartmann ("Kathryn Bartmann"), debtors/defendants

herein (the "Debtors-Defendants"), pursuant to Sections 523(a)(2)(A) and (6) of Title 11

of the United States Code (the "Bankruptcy Code"), aver as follows:

## JURISDICTION

1.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §
1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## INTRODUCTION

2.   This adversary proceeding is brought pursuant to Section 523(a) of the
Bankruptcy Code and Rule 4007 of the Federal Rules of Bankruptcy Procedure.  This
Adversary Complaint is brought because Bartmann and Kathryn Bartmann are liable to
the Plaintiffs in *In Re: CFS-Related Securities Fraud Litigation* (99-CV-0829-K(J))[1],
currently pending before Judge Kern in the Northern District of Oklahoma.  Plaintiffs'
claims therein are non-dischargeable by Bartmann and Kathryn Bartmann because: (i)
Plaintiffs' investment money was obtained from the Plaintiffs under false pretenses,
based on false representations and through actual fraud;  and (ii) Plaintiffs were willfully
and maliciously injured by Bartmann and Kathryn Bartmann.

3.   This action arises out of a scheme to defraud investors engineered by
Commercial Financial Services, Inc. ("CFS"), a privately-owned, now-bankrupt
Oklahoma company; CFS's President William R. Bartmann and Dimat Corporation

---

[1]   In the District Court, the Plaintiffs sued several individuals and entities in addition to
Bartmann and Kathryn Bartmann.  The other defendants in *In Re: CFS-Related Securities
Fraud Litigation* include: Jay L. Jones, Gertrude Brady, Mike C. Temple, Caroline
Benediktson, Bruce Hadden, Dimat Corporation, James D. Sill, Arthur Andersen LLP,
Chase Securities, Inc., and Mayer, Brown & Platt.  Although this Complaint in Bankruptcy
Court is limited to allegations against Bartmann and Kathryn Bartmann, the allegations in
the District Court against these other defendants remain, and this Complaint in no way
detracts from or diminishes the Plaintiffs' claims in the District Court.

- 2 -

("Dimat"), a company controlled by Bartmann, together with other officers and directors of CFS and other representatives of CFS. Bartmann was the President of CFS from its inception in 1986 through December 1997 and from June 1998 through mid-October 1998. At all times relevant hereto, Bartmann was also a CFS stockholder and the Chairman of CFS's Board of Directors. Upon information and belief, Kathryn Bartmann, at all times relevant hereto, was a CFS stockholder and a Director of CFS. At all times relevant hereto, both Debtors-Defendants participated in, were responsible for, directed and controlled the activities of CFS with regard to both the secret Asset Sales and the CFS securitizations.

4. During the relevant time period, CFS was one of the largest purchasers of charged-off credit card receivables in the United States. CFS purchased charged-off credit card receivables from several banking institutions and then, using what it claimed were sophisticated and proprietary collection methods to recover the receivables, allegedly realized a return significantly in excess of the purchase price of the receivables.

5. In 1995, CFS began bundling its assets (the credit card receivables) and transferring them to bankruptcy remote trusts, which in turn issued asset-backed securities to investors (the "CFS Securities"). The proceeds of the sales of CFS Securities went, in large part, to CFS, which also continued to service the assets and receive servicing fees from the trusts.

6. Upon information and belief, in furtherance of its fraudulent scheme to induce Plaintiffs and others to purchase CFS Securities, Bartmann and other officers and directors of CFS created fictitious monthly "collections" by secretly selling credit card

- 3 -

receivables at artificially inflated prices in order to inflate CFS's collection performance (the "Asset Sales").

7.  For example, during the period September 1997 through September 1998, CFS, through Bartmann, completed 13 secret Asset Sales to a related entity, Dimat, which resulted in an infusion of more than $63 million dollars to CFS.

8.  On June 26, 1998, Alliance Capital Management L.P. ("Alliance"), an investment adviser registered under the Investment Advisers Act of 1940, purchased approximately $8 million in SMART 1998-1 in a Rule 144A transaction on behalf of Plaintiff Pegasus Four Limited ("Pegasus IV"), as its investment advisor.  At about the same time, on June 30, 1998, Alliance also purchased approximately $82 million in CFS Securities that were issued by a bankruptcy-remote Oklahoma trust affiliated with CFS known as GREAT-A ("Global Rated Eligible Asset Trust" or "GREAT-A") in a Rule 144A transaction on behalf of the other Plaintiffs, as their investment adviser.  Alliance, on behalf of Pegasus IV, immediately (on July 2, 1998) exchanged its investment in SMART 1998-1 for an investment in the GREAT-A.  Therefore, in total, Alliance invested about $90 million in the GREAT-A on behalf of the Plaintiffs.

9.  The offering materials for GREAT-A, as well as the officers, directors and other CFS representatives who promoted the transaction to Alliance, including Bartmann, represented, among other things, that (i) CFS's performance record in collecting credit card receivables was at or better than its collection model; (ii) CFS did not re-sell its assets, i.e. the credit card receivables (with certain narrowly defined exceptions); (iii) CFS never sold credit card receivables to any CFS affiliate and (iv) the

- 4 -

servicing fees earned by CFS on its collections more than covered CFS's servicing costs. All of these statements were false.

10. CFS's offering materials and its representatives, including Bartmann, failed to disclose that CFS had been selling receivables on a monthly basis in order to prop up its collections to targeted levels and that many of these sales had been to an undisclosed affiliated entity (Dimat) at grossly inflated prices.

11. Moreover, CFS, its officers and directors, and its other representatives failed to disclose that proceeds from prior securitizations were secretly used to fund the purchase of CFS receivables in a scheme whereby Bartmann, CFS's President, channeled funds to Jay L. Jones ("Jones"), CFS's Executive Vice President, in exchange for Jones' CFS stock, and Jones, in turn, channeled such funds, in addition to advances he drew from CFS, to Dimat whose purchases of receivables from various CFS-affiliated trusts during 1997-1998 totaled approximately $63 million. These secret Asset Sales between CFS and Dimat, an affiliate of CFS, were on their face violative of the agreements creating the GREAT-A and other CFS-affiliated trusts.

12. CFS, and its representatives, including Bartmann, also failed to disclose that its true cost of collecting credit card receivables was more than CFS was being paid to service the credit card receivables.

## THE PLAINTIFFS

13. Plaintiff MPF Limited is a special purpose limited liability company formed under The Companies Law of the Cayman Islands with its principal place of business in Grand Cayman, Cayman Islands, British West Indies.

- 5 -

14. Plaintiffs Pegasus Two Limited, Pegasus Three Limited and Pegasus Four Limited are each special purpose limited liability companies formed under The Companies Law of the Cayman Islands with their principal places of business in Grand Cayman, Cayman Islands, British West Indies.

15. Plaintiff Iowa State University Foundation is a non-profit foundation operating pursuant to § 501(c)(3) of the Internal Revenue Code and organized to secure and manage private gifts and grants which benefit Iowa State University. Its principal place of business is in the State of Iowa.

16. Plaintiff Alliance Capital (Luxembourg) S.A. is the management company to plaintiffs Mansurii Doriimu and Mansurii Doriimu II, mutual investment funds organized under the laws of the Grand Duchy of Luxembourg with their principal places of business in Luxembourg. The principal place of business of Alliance Capital (Luxembourg) S.A. is in Luxembourg.

## THE DEFENDANTS

17. Defendant Bartmann is, upon information and belief, a resident of the State of Oklahoma. Bartmann was the President of CFS from its inception in 1986 through December 1997 and from June 1998 through mid-October 1998. At all times relevant hereto, Bartmann was also a CFS stockholder and the Chairman of CFS's Board of Directors. At all times relevant hereto, Bartmann participated in, was responsible for, directed and controlled the activities of CFS with regard to both the Asset Sales and the CFS securitizations.

- 6 -

18. In his position as President of CFS and Chairman of CFS's Board of Directors, defendant Bartmann was a controlling person of CFS. Bartmann had the power and the influence – and exercised such power and influence – to cause CFS to engage in the unlawful acts and conduct alleged herein.

19. Defendant Kathryn Bartmann is, upon information and belief, a resident of Oklahoma. At all times relevant hereto, upon information and belief, Kathryn Bartmann was a CFS stockholder and a Director of CFS. At all times relevant hereto, Kathryn Bartmann participated in, was responsible for, directed and controlled the activities of CFS with regard to both the secret Asset Sales and the CFS securitizations.

20. In her position as Director of CFS, defendant Kathryn Bartmann was a controlling person of CFS. Kathryn Bartmann had the power and the influence – and exercised such power and influence – to cause CFS to engage in the unlawful acts and conduct alleged herein.

## FACTUAL ALLEGATIONS

### CFS and the GREAT-A Securitization

21. CFS, a privately-owned company headquartered in Tulsa, Oklahoma, was founded in 1986 by Bartmann, Kathryn Bartmann and Jones, who together owned over 98% of CFS's stock.

22. By 1997, CFS had become one of the largest purchasers of charged-off credit card receivables in the United States. CFS purchased charged-off credit card receivables from several banking institutions and then, using what it claimed were

- 7 -

·sophisticated and proprietary collection methods to recover the receivables, allegedly realized a return significantly in excess of CFS's purchase price.

23. According to CFS and Bartmann, its success was due, in part, to a complex pricing model it had developed which enabled it to determine the likely recoverable value from any given charged-off credit card receivable portfolio. CFS and Bartmann referred to this value as estimated cash recovery or "ECR". According to CFS and Bartmann, the ECR was a "snapshot" of the portfolio's value at a particular moment.

24. When adjusted to include long-term payment agreements and interest payments, CFS and Bartmann claimed that it expected to collect 140% of the estimated ECR of receivables it purchased. CFS and Bartmann referred to this as its "base case" ECR model. On the other hand, CFS's "stress case" ECR model took into account variables, such as a lengthy economic recession, which could negatively impact CFS's ability to collect the loans.

25. CFS and its representatives, including Bartmann, as well as its investment bank Chase Securities, Inc. ("Chase"), repeatedly told investors and their investment advisers, like Alliance, that CFS's ECR model was conservative and that CFS had historically collected 179% of ECR.

26. The receivables purchased by CFS were its primary assets. In 1995, CFS began bundling these assets and offering them to investors as security for loans to CFS in what are known as "asset-backed securitizations." By June 1998, CFS had issued ten consecutive asset-backed securities deals collateralized by charged-off credit card receivables, which were placed in bankruptcy-remote trusts known as SMARTs

- 8 -

("Securitized Multiple Assets Related Trust"). Each SMART was denoted by the year and order within the year that the securitization occurred, such as "1996-1, 1996-2," etc.

27. In accordance with the trust documents, CFS would service the assets and receive collection fees from the trusts for doing so. In addition, CFS profited from the securitizations by receiving significantly more from the investors than it paid for the assets.

28. All of the SMART trusts were rated "A," or the equivalent, by one or more of the following rating agencies: Standard & Poor's Ratings Services ("Standard & Poor's" or "S&P"), Moody's Investors Service ("Moody's"), Duff & Phelps Credit Rating Co. ("Duff & Phelps" or "DCR") and Fitch IBCA, Inc. ("Fitch").

## Plaintiffs' Investment in the GREAT-A

29. In the spring of 1998, Chase offered Alliance, as investment adviser to Plaintiffs, the opportunity to invest in a new CFS securitization, the GREAT-A.

30. Unlike the SMARTs, which were static trusts, the GREAT-A transaction was designed as a master trust to fold in all of the assets of the SMARTs and permit the trust to continue to add new assets, rather than remain static. According to CFS, different SMART trusts often contained receivables from the same debtor, thus causing problems with possible violations of the Fair Debt Collection Practices Act ("FDCPA") when CFS employees separately contacted the same debtor about these related receivables. GREAT-A was allegedly designed to overcome that problem.

31. The proposed GREAT-A transaction was structured as a Rule 144A private placement, exempt from registration requirements, in which Chase and BT Alex.

- 9 -

Brown would act as the Initial Purchasers, buying the GREAT-A notes and immediately

re-selling them to their respective customers.

      32. In connection with the GREAT-A transaction, on behalf of Plaintiffs,

Alliance:

- reviewed various versions of the PPM issued by CFS and the documents annexed thereto;

- reviewed the CFS 1996/1997 Audited Financials and the Unqualified Audit Report issued by CFS's auditors Arthur Andersen LLP ("Andersen"), both of which were annexed as Exhibit C to the PPM;

- conducted on-site due diligence at CFS's facilities in Tulsa, Oklahoma;

- reviewed information provided by Chase, BT Alex. Brown, and CFS (including, but not limited to, a bound volume of charts and graphs entitled "Due Diligence Book: GREAT 1998-A" containing detailed statistics regarding CFS's historical collection rates and the GREAT-A "Base Case Model" (the "Due Diligence Book"));

- discussed the transaction with CFS's officers and directors, including Bartmann;

- discussed the transaction with representatives of Chase and BT Alex. Brown; and

- discussed the transaction with analysts from various rating agencies.

## Representations Regarding Asset Sales
## and CFS's ECR Model Contained in the PPM

      33. In May 1998, Alliance received from Chase a copy of the preliminary

PPM, which purported to detail all aspects of the GREAT-A transaction.  Among other

documents, CFS 1996/1997 Audited Financials and Andersen Unqualified Audit Report,

- 10 -

· and GREAT-A Base Case Model were annexed to the preliminary PPM as Exhibits C
and D, respectively.

34. According to the PPM, it was "prepared" by CFS.

35. The PPM contains a number of representations regarding asset sales,
including:

(a) First, CFS adopted and follows a "Credit and Collection
Policy" which contains a blanket prohibition against CFS selling assets to "any of its
affiliates." The Credit and Collection Policy also prohibits CFS, among other things,
from selling any loans "unless the cash purchase price to be received by the Servicer is at
least equal to 75% of the aggregate ECR Payoff Balances for such Loans." Moreover,
under this policy, CFS is precluded from selling more than 2.5 percent of the aggregate
ECR payoff balance of all of the GREAT-A assets. The PPM also states that CFS could
not alter the Credit and Collection Policy "without the prior written consent of the
Securityholders of at least 75% of the Security Balance of all outstanding Series, and
notice to the Rating Agencies. . . ." (PPM at 39-40, 69.)

(b) Second, both the PPM and note 2 to the CFS 1996/1997
Audited Financials ("Note 2") reference asset sales completed by CFS prior to December
31, 1997. According to both the PPM and Note 2, such asset sales solely related to real
estate loans and other non-credit card consumer loans. (PPM at 29; CFS 1996/1997
Audited Financials at 6.)

36. CFS's GREAT-A Base Case Model annexed to the PPM as Exhibit D,
projects amounts CFS expected to collect on the loans securitized in the GREAT-A over

- 11 -

a 108-month period.  The Base Case Model does not disclose or reference Asset Sales or the funds to be generated by such sales.

37. The CFS ongoing practice of engaging in substantial Asset Sales (in the tens of millions of dollars per year) was material to investors, but was omitted from the PPM and from the CFS 1996/1997 Audited Financials.  Moreover, the CFS practice of secretly counting those Asset Sales as "collections" in its books, records and reports was materially misleading to investors.  Both the PPM and CFS's financial statements were rendered materially false and misleading by these misrepresentations and omissions.

**Other Misrepresentations**
**Regarding Asset Sales and CFS's ECR Model**

38. In or about May 1998, CFS and Chase provided Alliance with a Due Diligence Book, which consists of various charts and spreadsheets regarding (i) CFS's historical collection performance as compared to CFS's base and stress case ECR models on prior securitizations, (ii) comparisons of the GREAT-A to previous securitizations, and (iii) the GREAT-A Base Case Model.  None of the charts and graphs contained in the Due Diligence Book stated that CFS's prior or projected "collections" were or would be generated from Asset Sales, much less secret Asset Sales to related entities.

39. On June 11 and 12, 1998, two Alliance analysts visited Tulsa, Oklahoma for the purpose of conducting due diligence regarding the GREAT-A at CFS's facilities.

40. On June 12, 1998, the Alliance analysts met at CFS's Tulsa headquarters with Bartmann, Gertrude Brady ("Brady"), CFS's Director of Investor Relations, D. Charles Welsh ("Welsh"), CFS's Director of Credit, W. Wayne Learned

- 12 -

· ("Learned"), CFS's Director of Operations. Thomas Hourican ("Hourican"), a Managing Director of Chase and former S&P analyst who had participated in the development of CFS's ECR model, Caroline Tyburczy ("Tyburczy") (a Chase analyst) and Farida Khan ("Khan") (a Chase Vice President) also attended the June 12 due diligence meeting, along with a representative of BT Alex. Brown.

41. During a discussion of CFS's collection process and ECR model attended by Bartmann and other CFS representatives, Hourican, Tyburczy, and Khan of Chase, and a representative of BT Alex. Brown, Bartmann and others assured the Alliance analysts that CFS's collection rates were very strong and that CFS was on target with the collection rates projected by its ECR model. Reinforcing that view, the due diligence books circulated by CFS and Chase showed that all securitizations were operating at or ahead of the ECR model.

42. Hourican also made a presentation during the due diligence meeting. He spoke at length about CFS's collection process. He also spent a significant amount of time describing CFS's ECR model and touted its historical, proven validity. Hourican also reiterated that collection trends for the SMARTs were strong and that CFS had historically exceeded the projected ECR base case. Bartmann said nothing to dispute this.

43. At one point during the due diligence meeting, the Alliance analysts asked why Mitchell Vernick ("Vernick"), CFS's CEO from January 1997 through May 1997, had suddenly resigned. Bartmann and the other CFS representatives responded that Vernick was "not a cultural fit." This response was materially misleading and designed

- 13 -

to hide the fact that Vernick had left because of concerns regarding CFS's failure to meet its collections and its continuing plans for future securitizations. None of the company representatives or the Chase representatives said anything to correct this misrepresentation and disclose the omitted truth regarding Vernick's departure.

44. During the June 12 meeting with Bartmann, Brady, Welsh, Leonard, Hourican, Tyburczy and Khan of Chase, and a representative of BT Alex. Brown, the Alliance representatives specifically asked (i) whether CFS had any subsidiaries or related entities and (ii) whether CFS had entered into any related-party transactions. Bartmann and other CFS representatives responded "No" to both questions. In addition, the Alliance representatives asked the CFS representatives to explain the reference to asset sales on page 29 of the PPM and in Note 2 to the CFS 1996/1997 Audited Financials. The CFS representatives, including Bartmann, assured the Alliance analysts that these references to asset sales related solely to the sale of old real estate-related assets and further stated that CFS did not meet its historical collection results through Asset Sales.

45. Throughout the due diligence process, the statements made by Bartmann and others regarding the non-existence of Asset Sales, CFS's collection performance, and the accuracy of CFS's ECR projections were confirmed by documents received from and representations made by representatives of CFS, Chase, BT Alex. Brown, CFS's auditor Andersen and others.

46. On June 26, 1998, Plaintiff Pegasus IV, through its investment advisor Alliance, purchased from Chase approximately $8 million of notes issued by SMART

- 14 -

1998-1 which were exchanged into the GREAT-A trust a few days later. On June 30,

1998, the rest of the Plaintiffs, through their investment adviser Alliance, purchased from

Chase approximately $82 million of notes issued by the GREAT-A trust.

      47. During July and August, Alliance received monthly reports and cash

distributions stating that the GREAT-A was meeting CFS's collection projections.

However, significant changes were taking place at CFS – the resignation of its CFO,

Mike Temple ("Temple"), a proposed due diligence investigation by Chase, CFS's

termination of its placement contract with Chase and Chase Manhattan's termination of

the revolving credit facility it had extended to CFS – all of which became publicized

weeks after September 30, when an anonymous letter was sent to the rating agencies

about CFS.

## The Anonymous Letter

      48. Sometime between September 30, 1998 and October 13, 1998,

Standard & Poor's, Duff & Phelps and several other rating agencies received copies of an

anonymous letter dated September 30, 1998. The anonymous letter raised certain serious

questions about CFS and its operations.

      49. Among other things, the anonymous letter stated:

- "Around 20% of all collections . . . are coming from asset sales" and "[i]n the last year, almost all of them have been to a company called Dimat" which was "incorporated a few days before the initial purchase of receivables in September 1997." The letter charged that Dimat was paying "two or three times the market rate for regular receivables"; that many sales occurred on the last day of the month and were in an amount that "just met the collection requirements of the securitization"; and that Dimat paid the same amount (as a percentage of principal) for all debt it purchased;

- 15 -

- Although a majority of "set ups" are delinquent, none are defaulted; the letter suggested that Jay Jones comes in on weekends and makes modifications to CFS's corporate system to manipulate these delinquencies;

- Several senior managers had left the company in the prior year and a half with "large severance packages." Further, CFS stopped having management meetings when the Dimat sales started.

50. In the weeks following their receipt of the anonymous letter, the rating agencies all placed the CFS Securities on credit watch and ultimately downgraded them. The first public manifestation of a change in CFS's status attributable to the assertions in the letter came on approximately October 9, 1998, when Standard & Poor's placed the CFS Securities on performance watch. Shortly thereafter, the text of the anonymous letter was released to the public.

51. On October 16, 1998, CFS issued a partial response to the publication of the anonymous letter. On behalf of CFS, Bartmann acknowledged the existence of the letter, stated that it was "the Company's position that there was no truth to [the] allegations" concerning any relationship between Dimat and CFS or its shareholders and said that the Company had retained outside counsel to investigate the allegations.

52. Four days later, on October 20, 1998, CFS issued another letter from Bartmann asserting that, "based on information that I discovered after October 16, 1998, there appears to be some basis for certain" of the allegations in the anonymous letter regarding links between Dimat and CFS or its shareholders.

- 16 -

## ·The Undisclosed Asset Sales

        53. CFS's first securitization transaction, SMART 96-1, closed on March

25, 1996. By the end of 1996, collections on this securitization were already far below

CFS's projections.

        54. In a memo from Welsh, CFS's Director of Credit, to Bartmann, dated

December 18, 1996, Welsh stated

> I don't have the answers and you will probably consider it
> treason that I even send you this but I am concerned and am
> becoming convinced that in the next 30-60 days we will fall
> woefully short of our objectives in this particular
> securitization. To continue to deliver at a $2 million plus
> level for the next year or more seems practically
> impossible. . . .
>
> In reviewing the status of the accounts with the department
> heads it is obvious we have fewer and fewer assets of
> sizable balance from which to draw the settlement funds
> needed to make up the monthly shortfall. You have already
> seen the quality of the deals we find ourselves approving
> each month to make it happen. . . . The situation is very
> critical.

        55. Bartmann, CFS, and CFS's representatives failed to inform anyone of

CFS's failure to meet its collection goals with respect to either the SMART 96-1 or its

later securitizations. Instead, CFS, through Bartmann and others, turned to monthly bulk

sales of its assets to cover up its collection problems. Only by selling loans in bulk could

CFS obtain immediate infusions of cash necessary to meet interest and principal

payments and report collection results in line with the performance goals established by

its ECR model.

- 17 -

56. Thereafter, unbeknownst to Alliance and the other investors, CFS engaged in substantial sales of its assets to Dimat and others, beginning, upon information and belief, in January 1997 and continuing each month (with the exception of March 1997 and March 1998) through and including September 1998 (i.e., the Asset Sales). Thus, a substantial amount of CFS income that had been represented to be "collections" in the materials provided to Alliance actually consisted of proceeds generated from Asset Sales. Moreover, the Asset Sales to Dimat, a related entity, were, upon information and belief, fictitious sales of CFS's credit card receivables at artificially high prices engineered for the sole purpose of inflating CFS's collection performance.

57. For example, upon information and belief, more than 40% of purported "collections" on the SMART 1996-2 trust were actually proceeds from Asset Sales to Dimat or The Cadle Company ("Cadle"). For the SMART 1996-4, 1996-3, and 1997-1 trusts, over 30% of purported "collections" were actually proceeds of the secret Asset Sales. Upon information and belief, for all four of these trusts, more than 25% of purported "collections" were proceeds generated from Asset Sales to Dimat alone.

58. Upon information and belief, Brady and Bartmann determined when a bid from a prospective purchaser would be accepted. Not one of Dimat's bids was rejected.

59. When CFS accepted a bid, it would, on behalf of the trusts affected, enter into a "Financial Asset Sale Agreement" ("FASA") with the purchaser. Bartmann signed numerous Financial Asset Sale Agreements on behalf of CFS.

- 18 -

60. In addition, for each trust that contributed loans to the sale package, CFS obtained a Power of Attorney from the appropriate trustee. The Power of Attorney appointed CFS as the attorney-in-fact for the applicable issuer and indenture trustee with respect to an attached list of loans for all purposes, including, but not limited to, the right to "transfer, sell, convey or assign the Asset to a person, entity or nominee."

61. Upon information and belief, successful bidders wired funds to CFS. If the loans sold would no longer be serviced by CFS, employees in CFS's "Loan Servicing" department sent the affected creditors "Goodbye Letters" informing them that their loan would no longer be serviced by CFS and forwarded all relevant documentation regarding the loans sold to the purchaser.

62. More than fifty CFS employees worked on the Asset Sales. E-mails that circulated between and among these employees indicate that they knew that the net value of loans offered each month had to meet a predetermined dollar value and that CFS's viability depended on the continuing Asset Sales. The vast majority of the CFS e-mails regarding the Asset Sales are labeled "Private" or "Confidential."

63. The Asset Sales were concealed from potential investors by Bartmann and CFS's representatives.

**Cadle Asset Sales**

64. In January 1997, Vernick, as CEO of CFS, upon information and belief, retained Consolidated Investments of America ("CIA") to provide CFS with "sophisticated and financially qualified buyers for the purchase of loan portfolios being offered for sale by CFS." Upon information and belief, CIA introduced Cadle to CFS.

- 19 -

65. During the period January 1997 through August 1997, CFS completed seven Asset Sales to Cadle whereby Cadle purchased loans with principal balances totaling $34.5 million for approximately $14.6 million or 42% of the principal amount. The sales occurred each month except for March 1997.

**Vernick Resigns and the Reasons for His Resignation Are Concealed**

66. On or about May 31, 1997, after only five months as CFS's CEO, Vernick resigned.

67. At some point during his short tenure as CFS's CEO, Vernick concluded that CFS would be unable to meet its "base case" ECR projections in connection with many of its securitizations. In an unsigned, undated resignation letter to Bartmann, Vernick wrote:

> As each week that I have been at CFS has past [sic], I have grown increasingly concerned about the viability of our securitization model. . . . After observing some of the organizational ineffectiveness in Credit, I hoped that re-engineering would explain the continued and growing miss from Base Case performance. However, as I have recently focused on the trends in every securitization and compared this to the increasing levels of performance required in the Base Cases, I am convinced that no amount of improvement in productivity can offset this growing differential.

68. Given his concerns about the performance of CFS's securitizations, Vernick was "no longer comfortable representing to investors that they [were] making a risk-reward decision that has a one-third performance cushion, or that [he] had a high confidence that they [would] be repaid in full." Vernick realized that making such

- 20 -

statements to investors "would cause the transactions to either not be rated or have the

advance rate reduced to the point where no cash could be taken out of the deal."

69. Moreover, Vernick knew that CFS's collection costs far outweighed

the servicing fees that it was earning by actually collecting credit card debts. Vernick

knew that CFS could not survive without the proceeds generated from the ongoing

securitizations:

> If CFS cannot create cash by doing new deals, it will not be
> able to fund current overhead and will need to make drastic
> cuts in expenses in order to live within the cash flow from
> servicing fees.

70. Vernick stated that he would only stay on as CFS's CEO if Bartmann

"would stop securitizing transactions." Vernick concluded:

> Given my conclusion, I can no longer lead the company
> under its present operating model. Therefore, I believe I
> must resign immediately, as it is unfair to you and to
> investors to remain, given my views.
>
> If by some remote chance I have incorrectly assumed your
> point of view on this matter, and you would be prepared to
> stop securitizing transactions, I would be prepared to stay
> and help in any way I could. Since I do not assume this is
> your point of view, I regrettably must resign.

71. On May 31, 1997, Bartmann sent an e-mail to all CFS employees

stating that he had "asked for and accepted the resignation of Mitch Vernick . . . on

account of disagreements about the company." Bartmann called these disagreements

"philosophical differences."

72. Bartmann withheld the reasons for Vernick's departure from investors.

Indeed, at a due diligence meeting held at CFS in June 1998, Bartmann and others were

- 21 -

asked about Vernick's resignation. Bartmann responded that he had left because he was "not a cultural fit" at CFS. Bartmann's response was materially misleading and designed to hide the fact that Vernick had left because of concerns regarding CFS's failure to meet its collections goals, the continual drop-off in collection performance, its continuing plans for future securitizations, and Vernick's discomfort with what CFS was telling investors.

73. CFS included a weak and utterly misleading disclosure regarding Vernick's departure in subsequent PPMs. It stated that Bartmann and Vernick had "different perspectives and opinions relating to a variety of issues concerning the business of CFS, including, among other matters, the management of the collection process, its capital market strategy and the value of the assets serviced by it."

74. CFS removed even this elliptical and deceptive information from the PPM circulated to prospective investors, including Plaintiffs, in connection with the GREAT-A securitization. Instead, the issue was addressed "orally" as a lack of "cultural fit." The truth was concealed by Bartmann, CFS, and CFS's other representatives.

**Dimat Asset Sales**

75. In 1997, collections on CFS's SMARTs continued to fall further and further behind CFS's ECR model. Nevertheless, CFS, through Bartmann, continued to launch new securitization transactions without disclosing such information. According to previously undisclosed documents, CFS's meager collections were not sufficient to cover its operating costs. Indeed, CFS could not cover its operating costs without the investor monies it received from each new securitization transaction. Accordingly, Bartmann and

- 22 -

· others continued to engage in a scheme whereby proceeds from Asset Sales were disguised as collections to mask CFS's low collection rates and induce investors to invest in CFS's new securitization transactions.

76. By the summer of 1997, CFS was completely dependent on the Asset Sales to enable it to meet its collection projections. An e-mail dated August 12, 1997 authored by Bruce Hadden ("Hadden"), Development Director of CFS, evidences CFS's reliance on the Asset Sales in the summer of 1997: "If we don't close our sales, we don't make August numbers as a company, and trust me, that is not a good thing."

77. In mid-1997 CFS was rapidly running out of "performing loans" (receivables as to which it had some expectation of payment by the obligors) that it could sell to third parties because it had sold its best credit card receivables from the SMARTs to Cadle during the prior year. At about the same time, Cadle was becoming more and more reluctant to continue purchasing CFS receivables.

78. On September 17, 1997, Hadden sent Brady an e-mail stating:

Not too optimistic on a successful performing sale this month. Bids are due tomorrow. Talked with Cadle today. Don't look for them to be bidding.

I'm assembling nonperforming packages as I write, potentially to send to Sill, or Dimat, as a back up.

79. Upon information and belief, CFS did not send Cadle a bid announcement regarding its September 1997 Asset Sale. Moreover, upon information and belief, CFS did not seek bids from anyone other than Dimat with regard to most of the Asset Sales during the period from September 1997 through September 1998.

- 23 -

80. CFS began selling assets to Dimat, an undisclosed related entity, in September 1997. Dimat was a shell created solely to further the fraudulent scheme to inflate CFS's collection performance and induce investors, like plaintiffs, to purchase CFS Securities. Some of the facts which support this conclusion are the following:

- Dimat was incorporated merely eight days before it purchased assets from CFS;

- Upon information and belief, James D.Sill ["Sill"] was Dimat's only employee;

- Upon information and belief, Jones, Bartmann's co-founder of CFS and shareholder, director and officer of CFS, and Bartmann infused Dimat with the funds used to purchase CFS assets;

- Dimat retained CFS to service the loans it purchased from CFS;

- Upon information and belief, Dimat's only source of income was the monies CFS collected as servicer of the Dimat loans; and

- Many of the Dimat Asset Sales were made without fully executed contemporaneous documentation of the terms of the sale.

81. Sill (who, upon information and belief, is Jones's former lawyer and business partner) incorporated Dimat on September 22, 1997. Just eight days later, Dimat bought nearly $4 million in loans from CFS. This was the first of thirteen Asset Sales by CFS to Dimat within the next year.

82. Upon information and belief, Jones, a shareholder, director and officer of CFS, was a principal of Dimat. Dimat, therefore, is an entity which is "related" to CFS. As a result, the Dimat Asset Sales violated CFS's Credit and Collection Policy and the representations made by CFS and Bartmann that CFS had never transacted business with a related entity.

- 24 -

83. During the period September 1997 through September 1998, CFS completed thirteen Asset Sales to Dimat whereby Dimat purchased loans with principal balances totaling $217 million for approximately $63.3 million, or 29% of the principal amount. Upon information and belief, the percentage of principal paid by Dimat for each of the thirteen loan packages was virtually identical – between 28% and 32% of principal balance.

84. Dimat paid extraordinarily high prices for the CFS receivables. Although the receivables sold to Dimat were carried by the SMARTs at a minimal value (which enabled CFS to sell these receivables without technically violating the 5% cap on Asset Sales typically contained in the SMARTs documentation), Dimat paid millions of dollars for the receivables. Indeed, Dimat paid approximately _five_ times the ECR of the non-performing loans it purchased from CFS. Dimat paid 29 to 30 cents per dollar of the face amount of receivables that were known as "skips" (where the debtor had "skipped" without forwarding an address or telephone number thereby making it difficult even to contact the debtor, much less collect on the debt), despite the fact that, according to Welsh, no one in the collections industry would pay over 17 cents for even the finest such assets.

85. According to Welsh, after November 1997, the already low quality of receivables sold to Dimat declined even further. Hadden expressed concern that CFS had run out of performing receivables that could be sold out of SMART 96-2 and, beginning in November 1997, only receivables with a _zero_ ECR could continue to be sold. Nonetheless, Dimat continued to pay the same price – if not _more_ – for CFS's

- 25 -

· receivables. Welsh wrote: "This can't be explained & Bill [Bartmann] & GAB [Brady] refuse to discuss."

86. CFS also benefited from the Dimat Asset Sales by receiving a 20% servicing fee for servicing the Dimat loans. Dimat did not conduct its own collections operation or hire anyone else to do so. Rather, it left the receivables with CFS to service, gave CFS discretion to settle accounts, and did not even ask CFS to report on its collections.

87. On September 22, 1997, Bartmann authorized CFS's bank, Liberty Bank & Trust, to advance $4,187,000 from CFS's tax reserve account to Jones' Calamity Jones account. This money was subsequently transferred by Jones to Dimat and by Dimat back to CFS in connection with the first known Dimat Asset Sale.

88. Monies collected by CFS on Dimat's behalf were typically sent to Dimat on an expedited basis. Although CFS only collected a small fraction of the principal balance on the loans sold, Dimat was not concerned about CFS's low collection rates and continued to bid between 28 and 30 cents, despite the fact that CFS was recovering a mere 1% of Dimat's investment.

89. Although Dimat paid more than $50 million for CFS receivables between September 1997 and May 1998, Dimat demanded no reports on collections whatsoever. As noted by Welsh on or about February 25, 1998, "no inquiry has been made as to our results, nor any report requested."

90. In addition, according to February 25, 1998 notes, Welsh observed that Bartmann and Brady were not as concerned with pleasing Dimat as they had been with

- 26 -

' other investors and purchasers. Welsh wrote: "Curiously there is no comment from Bill or Gertrude about collecting these loans. In the past great concern was shown about any investor, especially one who was buying regularly. This has never been the case with Dimat – even as dependent as we are on their purchases."

## Jones Funded the Dimat Asset Sales
## With Money Provided by CFS and Bartmann

91. The Dimat sales were financed by dividends paid to Jones on his CFS stock and purchases of CFS stock by Bartmann from Jones.

92. First, the aggregate amount of Dimat loan sales, on the one hand, and CFS stock sales plus dividends, on the other, is nearly identical. Between September 1997 and September 1998, Dimat paid CFS a total of $63,255,837 in connection with the Asset Sales and, during the same period, Jones was paid a total of $50,750,000 from Bartmann in exchange for Jones' CFS shares and approximately $14 million from CFS in dividends on his CFS stock (for a total of approximately $64,750,000).

93. Second, the Dimat asset sales were closely related in time to stock sales by Jones to Bartmann. CFS sold loans to Dimat once each month between September 1997 and September 1998, except for March 1998; Jones sold CFS stock to Bartmann once each month between September 1997 and September 1998, except for March 1998.

94. Third, documents produced by both Sill and Jones evidence numerous transfers of money from Jones and his company, Calamity Jones Entertainment Inc. ("Calamity Jones"), to Dimat during the period from September 1997 through October

- 27 -

· 1998.  Notably, upon information and belief, there were no transfers of funds between these entities during March 1998.

95. Thus, upon information and belief, the funds Dimat used to pay CFS for loan packages originated with CFS – either directly or through Bartmann.  Those funds were derived from selling securitized loans to investors, who invested, in part, relying on the illusion that, because of CFS's strong collection history, the investments were safe – an illusion made possible only by the secret Asset Sales.  This circular flow of cash – from CFS and Bartmann to Jones, from Jones to Dimat, and then from Dimat back to CFS – is consistent with a classic Ponzi scheme.

## CFS Relied on Dimat
## Asset Sales to Meet Collection Goals

96. The CFS Employees who worked on the Dimat Asset Sales were well aware of the importance of the Dimat Asset Sales and the need for an Asset Sale to close each month.  For example, e-mails and other correspondence exchanged between and among CFS employees stated the following with regard to Dimat Asset Sales:

- "If we don't close our sales, we don't make August numbers as a company, and trust me, that is not a good thing."

- "Dimat will bid off of hard figures for the December sale.  Obviously, we again are working under a ticking clock, so we must not waste a moment to close out by month's end."

- "Since this sale needs to close in February, this is of an urgent nature and needs immediate attention."

- "At this moment, I'm EXTREMELY frustrated and disappointed.  Without sales packages, no sale.  No sales, no revenue.  No revenue, the securitizations bust.  The securitizations bust, no CFS.  It's really that simple. . . . THE PACKAGES HAVE TO GO OUT TODAY."

- 28 -

97. E-mails exchanged between and among CFS employees as well as other documents indicate that CFS expected Dimat – rather than other prospective purchasers – to continue purchasing CFS assets during 1998. For example, Welsh noted:

> Still no concern over performance – Bill [Bartmann]
> mentioned possible move of assets from CFS for servicing
> – No concern – No question from Dimat over performance
> – No urgency for other bidders per Bruce. There is an
> unspoken assumption Dimat will purchase – very strange.

98. Moreover, in a "Confidential" e-mail dated July 15, 1998 from Welsh to Brady, Welsh explained why he believed a separate "dialer team" should be devoted to servicing the Dimat loans. Welsh stated, "With the considerable investment this person has with CFS and the possible need for sales in the future it seems imprudent to do anything but work these assets as a separate pool of loans." When this e-mail was forwarded to Bartmann later that day, Bartmann responded "We should do whatever will produce these results .... not just because it is the right thing to do .... it also inures to our benefit if we would expect them to have an interest in the future."

**The Dimat Asset Sales Were Engineered by Bartmann**

99. E-mails and handwritten notes exchanged among the CFS employees in CFS's Business Development department demonstrate an effort by employees to "hit" pre-selected performance numbers by selling a pre-determined amount of loans to Dimat. Upon information and belief, the criteria used for selecting loans to be sold to Dimat varied over time.

100. In March 1998, CFS's collections on all receivables serviced by CFS plummeted. Upon information and belief, the drastic fall in cash recovery was

- 29 -

attributable to the absence of an Asset Sale to Dimat that month. Without the flow of funds from Dimat, collections were very small and certainly not the high historical collections that CFS had claimed when it was inducing investors to invest.

101.    According to a July 1, 1998 e-mail sent by Bartmann, Chase had told Bartmann in January 1998 "why and how it would be IMPOSSIBLE to create a Master Trust." Nonetheless, in the months that followed Chase's statement, Bartmann were soliciting buyers for yet another CFS securitization transaction – the GREAT-A or "Master Trust." To induce investment in the GREAT-A, CFS would need to meet its "base case" collection goals – an impossibility without Dimat Asset Sales. As Welsh noted: "March 98 – No Sale to Dimat – missed goals by large percentage. It appears Master Trust may be possible again but will need $5 million in April & May. WRB [Bartmann] says it has to close in June, since 962 base .... delivery will be about impossible."

102.    Bartmann, Brady and Michael Zarrilli of Chase consulted about how to explain the March shortfall to investors in the CFS securitizations. Zarrilli drafted a false and misleading explanatory memorandum to investors and sent it to Bartmann and Brady for review on April 3, 1998. In the memorandum, drafted by Zarrilli, CFS's poor collection performance is blamed on a change in staffing schedules, a failure to optimize CFS's predictive dialer system and a growing number of obligors with multiple accounts serviced by CFS. Zarrilli did not mention CFS's failure to conduct a March Asset Sale to Dimat. Instead he falsely represented:

- 30 -

> We have high confidence that March was an operational glitch as
> opposed to a fundamental problem because the weakness was not
> isolated to any particular securitization.

The memorandum encouraged investors to contact Zarrilli with any questions. This
memorandum was circulated to investors in the SMARTs.

103.   CFS began selling assets to Dimat again in April 1998 to meet its
collection goals. CFS completed one Asset Sale with Dimat in April 1998. In May 1998,
for the first time ever, CFS completed two Asset Sales to Dimat. Upon information and
belief, the May Asset Sales to Dimat were devised by the defendants in order to ensure
that CFS would meet its collection goals for the month and appear attractive to
prospective investors in the GREAT-A, which was scheduled to close in June.

104.   In a May 4, 1998 e-mail sent from CFS's Elsa King to Ronald
Steffler ("Steffler"), King asked Steffler to "begin pooling accounts for possible loan
sales for the month of May." After providing some criteria which King says "may have
to be tweaked . . . depending on the product generated," King asked Steffler to tell her
when he had the "preliminary pulls ready so we can see the $ amounts generated and go
from there."

105.   The next day, King sent Steffler another e-mail, saying, "Okay,
time for some tweaking!" King's May 4 e-mail lists proposed May loan sales for both
performing and non-performing loans, broken out by securitization. The target loan sale
numbers are in round dollar amounts and are said to represent "the numbers we need for
Principal balances in each securitization . . . per the preliminary criteria." King then

- 31 -

· compared the May sales goals to the principal balances generated by Stiffler's initial "pulls."

106.    For several securitizations, the "pulls" were insufficient to meet the sales goals, so King asked Steffler to adjust the criteria for loan selections from these securitizations in order to generate additional loans to be included in the sale package. As discussed below, the May sales goals listed in King's e-mail match up very closely to the first Asset Sale made to Dimat later in May.

107.    On May 12, 1998, Welsh informed Bartmann that CFS was "$1 million dollars behind last month on the settlement log and $5 million ahead on conversions" and asked Bartmann whether he wanted to "stress cash more than this and possibly starve conversions more or just push for both sides to improve?" Bartmann responded:

> Charley, I probably need Gertrude's opinion. My thought would be to go for cash and let conversions be whatever they will be.
>
> At this point I can't predict a sale this month . . . so we will need all of the cash we can get.

108.    By May 26, 1998, CFS had yet to close an Asset Sale and was behind its April "collections" by 20%. At 4:00 p.m. on May 26, 1998, Welsh wrote Brady: "By the way, when do I die over May numbers? I assume Bill [Bartmann] is seeing the reports that we are behind April by about 20% on average . . . Do I need to address this directly or does he know?"

109.    At 4:04 p.m. that day Brady responded: "He knows but probably would not hurt to tell him where numbers stand at the moment. Elsa King said that she

- 32 -

‧ ⁻ thought Dimat was bidding, however, that was this morning and I have not heard anything from here as of yet."

110.    At 4:28 p.m., King notified Brady, Ramakrishnan and Hadden that she had received an $8 million dollar bid from Dimat and asked Brady to "advise if approved." Two minutes later, Brady e-mailed King, Ramakrishnan, Hadden, Benediktson, Bartmann and Gary Betow: "Consider this e-mail approval to accept the bid contingent upon funds being here no later than Thursday, May 28."

111.    Upon information and belief, CFS accepted Dimat's bid to pay 28.79% (approximately $8.5 million) of the principal balance of the loans offered for sale on or about Friday, May 29, 1998.

112.    After closing this Asset Sale, however, CFS was still behind its May collection projections. Indeed, e-mails exchanged among CFS employees and notes recently produced by Welsh establish that CFS was working diligently to sell even more assets to Dimat before month's end.

113.    According to Welsh's notes, Bartmann called Welsh on the morning of Saturday, May 30, 1998. Bartmann was "very upset" because, according to Brady's calculations and despite the $8.5 million Asset Sale to Dimat two days earlier, CFS had not met its May "collection" goals.

114.    Bartmann asked Welsh to review the projections and "collection" data. Welsh confirmed that CFS was approximately $2.5 million short of its ECR goals. Upon information and belief, Bartmann then directed Brady to engineer another sale to Dimat within the next two days so that CFS could meet its May collection projections.

- 33 -

115.    Using Dimat's May 29, 1998 bid of 28.79%, Bartmann determined that CFS would need to sell to Dimat another $9 million dollars of loans in order to generate the monies CFS needed to meet its May goals. Accordingly, upon information and belief, Ramakrishnan spent Sunday, May 31, 1998 running various programs to pull loans totaling $9 million. At 6:13 p.m. that day, Ramakrishnan sent an e-mail to King and Brady informing them that he was leaving disks containing the additional loans to be sold to Dimat on his desk.

116.    According to Welsh's notes, Hadden told Welsh on Monday, June 1, 1998, that CFS had completed another $2.5 million Asset Sale to Dimat over the weekend. Hadden told Welsh that the sale was "done" on Saturday evening and that the loan package was put together on Sunday.

117.    Indeed, on Monday, June 1, 1998, at 9:06 a.m., King sent Sill a letter regarding the "revised principal balances and bid amounts for the May loan sale using [Dimat's] aggregate bid amount of .2879." Notably, the letter did not ask Dimat to "bid" on the loans. Instead, based on Dimat's prior bid of 28.97% in May, King calculated that Dimat would bid $10,770,577 on the loans offered and included this bid price in her letter. The letter also stated that if the terms were acceptable, closing and funding of the additional amount of $2,458,307 would have to occur that very day.

118.    Upon information and belief, King also sent Sill a letter accepting Dimat's $10,770,577 bid some time that day. This letter also provided Sill with detailed information regarding the amounts to be wired to each of the eight distinct bank accounts held in the name of each SMART participating in the sale.

- 34 -

119.    Remarkably, at approximately 4:24 p.m. on June 1, Sill sent King a letter via facsimile stating:

> In order to expedite and get this wire transfer accomplished today, we have transferred the $2,458,307 to the one account discussed Friday, i.e.: Bank One, Oklahoma #10300648 to the account of Securitized Multiple Asset Rated Trust 1996-4, Account No. 020973065.
>
> I understand you will transfer between the respective proper accounts.

120.    Thus, the defendants collectively engineered an additional Asset Sale to Dimat for $2.4 million over the weekend of May 30-31, 1998 for the sole purpose of ensuring that CFS met its collection goals for that month.

## Misrepresentations and Omissions Made by the CFS and Bartmann to Induce Plaintiffs to Invest in the GREAT-A

121.    The material, undisclosed Asset Sales to Dimat and others were part of a scheme to inflate the true collection experience of CFS in order to enhance the attractiveness of the GREAT-A notes to investors.

122.    The misrepresentations made by Bartmann consist of material misstatements and omissions in the PPM and the Due Diligence Book, as well as those made orally by Bartmann and CFS's representatives to the Alliance analysts.

123.    Examples of the material misrepresentations and omissions made by Bartmann, among others, include:

(a) The PPM's assurance that no Asset Sales to related entities occurred and Bartmann's assurances that CFS had never transacted business with such an entity, which were gross misstatements. Indeed, by the time the GREAT-A transaction

- 35 -

`closed, CFS had completed thirteen Asset Sales to Dimat, a related entity, which resulted in an infusion of over $63 million to CFS.

(b) Bartmann's assurances regarding the references to asset sales contained in the PPM and Note 2 to the CFS 1996/1997 Audited Financials, which were patently false. By the date of the Alliance due diligence trip, CFS had completed a total of 18 Asset Sales to Cadle and Dimat, involving loans from the SMART 96-3 and 97-1 trusts that were combined with other trusts to form the GREAT-A. Over 30% of the "collections" for the SMART 96-3 and 97-1 trusts were generated from Asset Sales.

(c) The information contained in the Due Diligence Book, the CFS 1996/1997 Audited Financials, annexed to the PPM as Exhibit C, and Bartmann's representations that CFS's collection rates were very strong and "on target" with its ECR models, which were false and materially misleading because they incorporated the proceeds from the Asset Sales as "collections" and failed to mention the existence of the Asset Sales. Indeed, CFS's actual collection rates were far lower than were represented to investors – especially if the Asset Sales are not counted.

(d) The GREAT-A Base Case Model, described in the PPM and annexed thereto at Exhibit D, which was materially misleading because it failed to disclose that, consistent with its historic, but undisclosed, practice, CFS intended to meet the projections of its collection model by selling assets.

(e) The failure by Bartmann and Jones to disclose that they had concocted a scheme that would enable Jones to provide Dimat with the necessary funds to purchase assets from CFS at inflated prices on a monthly basis.

- 36 -

(f) The failure by Bartmann to disclose (i) the existence of the Asset Sales, or (ii) that a substantial portion of "collections" reflected in CFS's financial statements and other documents were actually proceeds generated from such sales, or (iii) that Jones was a principal of Dimat, or (iv) that CFS's historic collection performance was <u>not</u> at or better than its ECR model.

(g) Bartmann's failure to disclose that CFS's collection rate had dropped significantly in March 1998 – the only month during the period September 1997 through September 1998 that CFS did <u>not</u> sell assets to Dimat. CFS's collection performance was so poor in March 1998 that Bartmann sent a letter to all "CFS SMART Program Investors" on April 8, 1998 alerting them to the "weak collections month for SMART transactions through 97-4" and giving false reasons for CFS's poor performance. Bartmann failed to tell investors that in the month of March 1998, CFS failed to consummate any Asset Sales and that the absence of Asset Sales was in fact the predominant reason for the material decline in "collections" in March.

(h) Bartmann's misrepresentation regarding the reason for Vernick's resignation after only four months as CFS's President. Vernick resigned from his position as CFS's President because of his concerns about CFS collections and the performance of CFS's securitizations. Indeed, Vernick refused to stay with CFS as long as Bartmann insisted on continuing to securitize CFS's assets.

124. Such misrepresentations and omissions were material to Alliance's decision to purchase the 1998-1 and GREAT-A notes on behalf of Plaintiffs.

- 37 -

125.    Bartmann knew that the above misrepresentations and omissions were false at the time they were made.  At a minimum, as President of CFS, Bartmann was in a position to know the falsity of the representations made to Alliance.  Moreover, Bartmann was essential to the Asset Sale process:  Bartmann authorized the Asset Sales and, along with Benediktson, executed the Financial Assets Sale Agreements on behalf of CFS.

**Bartmann's Role in the Scheme To**
**Inflate CFS's Collection Performance**

126.    Bartmann directed and oversaw each of CFS's Asset Sales. Among other things, Bartmann directed Brady and Hadden regarding monthly bid goals, wrote letters to trustees seeking approval letters in connection with the Asset Sales, and was routinely updated regarding the terms of bids received and status of Asset Sales to be consummated by CFS.

127.    Bartmann was also aware that CFS serviced the loans sold to Dimat.  Indeed, Bartmann even signed a request letter (on or about August 3, 1998) asking Bank One to wire transfer over $125,000 from an account in the name of "CFS as Servicer for Dimat Corp." to CFS.

128.    Bartmann knew that CFS was relying on the Asset Sales to meet its collection goals and pressured Brady, Hadden and Benediktson to consummate the sales. For example, in an e-mail dated March 27, 1998, Hadden wrote "FYI Confidential: my sale just fell apart for the month of March (buyer backed out at last minute).  Things may be a little gloomy on 55 next week.  Thought I'd better alert you know [sic] before your meeting with Bill."

- 38 -

129.    As described above, Bartmann made positive representations to Alliance concerning CFS's past collection performance and CFS's ability to collect sufficient revenue in the future to meet its projected "base case" and "stress case" collections models. In none of these communications did Bartmann tell Alliance that CFS was selling loans out of the SMARTs in order to meet its monthly collection goals rather than collecting that money from the credit card obligors. In none of these communications did Bartmann tell Alliance that CFS was using revenue generated from recent securitizations, which had been distributed as dividends to Bartmann and Jones, to enable Dimat to buy millions of dollars in loans from the SMARTs in order to make its monthly "base case" and "stress case" numbers, or to make monthly payments of principal and interest to investors in the SMART securitizations.

**Kathryn Bartmann's Role in the Scheme To**
**Inflate CFS's Collection Performance**

130.    Kathryn Bartmann co-founded CFS with Bartmann and Jones in 1985 and was a member of CFS's board of directors. Often quoted in the press, Kathryn Bartmann stated at various times that CFS's ability to provide excellent returns for noteholders came from the hard work of CFS's personnel, CFS's supposedly sophisticated and thorough credit card receivable review, and organized, well-planned collection efforts. CFS included such statements in the due diligence and other marketing materials distributed to potential investors. Kathryn Bartmann also served on committees of the CFS board, and is a substantial shareholder of the company. Based on these positions, Kathryn Bartmann had the power and influence to prevent and correct the misrepresentations and omissions alleged in this Complaint.

- 39 -

## Plaintiffs' Injuries

131.    In deciding to invest in the CFS Securities on behalf of the Plaintiffs, Alliance relied upon, among other things, the representations contained in the PPM and documents attached thereto, the CFS 1996/1997 Audited Financials, the Due Diligence Books and representations made by Bartmann and others during due diligence meetings. The misrepresentations made in these offering materials and due diligence meetings, which are discussed above in detail, grossly inflated the price of the CFS Securities which Plaintiffs purchased. If Alliance had known the truth concerning these misrepresentations, it would not have invested on behalf of the Plaintiffs in the CFS Securities. The materiality of the misrepresentations has been demonstrated in the dramatic decline of the market price of the GREAT-A notes following disclosure of the truth underlying CFS's fraudulent scheme.

## Prior Pending Litigation

132.    The Plaintiffs originally invested approximately $90 million in CFS Securities, and the loss in value of the CFS investments has damaged the Plaintiffs.

133.    On or about September 30, 1999, Plaintiffs sued Bartmann and Kathryn Bartmann, among others, in case number 99-CV-0829-K(J) which is jointly administered as a part of *In Re: CFS-Related Securities Fraud Litigation* in the United States District Court for the Northern District of Oklahoma.

134.    About 15 other similar suits, alleging approximately $1.2 billion in damages, have also been filed and are consolidated with the Plaintiffs' case in *In Re: CFS-Related Securities Fraud Litigation* for discovery purposes. Discovery has been

- 40 -

conducted on a coordinated basis there, with depositions of fact witnesses to be completed by July 31, 2004.

135.    The extent and amount of Plaintiffs' claims against Bartmann and Kathryn Bartmann are pending, subject to the stay of this bankruptcy case.

## FIRST CLAIM FOR RELIEF:

### (Against Bartmann and Kathryn Bartmann Under 11 U.S.C. § 523(a)(2)(A))

136.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 135, inclusive, as if fully set forth herein.

137.    This claim is asserted against Bartmann and Kathryn Bartmann pursuant to 11 U.S.C. §523(a)(2)(A).

138.    To induce the Plaintiffs to purchase the CFS Securities, Bartmann and Kathryn Bartmann obtained money from the Plaintiffs under false pretenses, made false representations and committed actual fraud.

139.    Among other things, in order to induce the Plaintiffs to invest in the CFS securities, Bartmann misrepresented that (i) CFS's performance record in collecting credit card receivables was at or better than its collection model; (ii) CFS did not re-sell its assets, *i.e.* the receivables (with certain narrowly defined exceptions); and (iii) CFS never sold assets to any CFS affiliate. All of these representations were false. In addition, Bartmann failed to disclose that CFS had been selling receivables on a monthly basis in order to prop up its collections to targeted levels and that the majority of these sales had been to an affiliated entity, Dimat, at inflated prices. Bartmann made

- 41 -

further material misrepresentations and omissions of material facts to keep investors from discovering the fraudulent nature of the ECR model and Asset Sales.

140.    At the time he made these false representations, Bartmann knew these statements were false and/or misleading. Therefore, Plaintiffs' investments were based on false pretenses and Bartmann's acts and activities constitute actual fraud upon the Plaintiffs.

141.    In order to induce the Plaintiffs to invest in the CFS securities, Kathryn Bartmann, in the press and in due diligence and marketing materials distributed to potential investors, misrepresented that CFS's ability to provide excellent returns for noteholders came from: (i) the hard work of CFS's personnel, (ii) CFS's supposedly sophisticated and thorough credit card receivable review, and (iii) organized, well-planned collection efforts. All of these representations were false.

142.    At the time she made these false representations, Kathryn Bartmann knew these statements were false and/or misleading or should have known as a member of the CFS Board and a substantial shareholder in CFS, and therefore Plaintiffs' investments were based on false pretenses and Kathryn Bartmann's acts and activities constitute actual fraud upon the Plaintiffs.

143.    Each of the Plaintiffs and their investment adviser, Alliance, were at all relevant times unaware of the true facts and reasonably believed the false representations made by Bartmann and Kathryn Bartmann to be true.

144.    In reasonable reliance upon the misrepresentations by Bartmann and Kathryn Bartmann and unaware of the true facts, Plaintiffs, through their investment

- 42 -

adviser Alliance, were induced to and did purchase the CFS Securities. But for these false pretenses and false representations, Plaintiffs would not have invested in these securities.

145.    As a direct and proximate result of this scheme to defraud, Plaintiffs have suffered damages, including purchasing the CFS Securities at a grossly inflated price, in a total amount to be determined at trial.

146.    Because the Debtors-Defendants Bartmann and Kathryn Bartmann obtained money from the Plaintiffs under false pretenses, made false representations and committed actual fraud, the claims of the Plaintiffs should be determined to be excepted from discharge.

## DEBTORS-DEFENDANTSSECOND CLAIM FOR RELIEF:

## (Against Bartmann and Kathryn Bartmann Under 11 U.S.C. § 523(a)(6))

147.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 146, inclusive, as if fully set forth herein.

148.    This claim is asserted against Bartmann and Kathryn Bartmann pursuant to 11 U.S.C. § 523(a)(6).

149.    By engaging in a scheme to defraud investors, including the Plaintiffs, Bartmann and Kathryn Bartmann caused willful and malicious injury to the Plaintiffs.

150.    As described fully in the allegations above, Bartmann's material misstatements and omissions were willful as Bartmann had access to the truth. Plaintiffs were injured by Bartmann's willful and malicious behavior toward them which includes,

- 43 -

among other things, Bartmann falsely representing that (i) CFS's performance record in collecting credit card receivables was at or better than its collection model; (ii) CFS did not re-sell its assets, *i.e.*, the receivables (with certain narrowly defined exceptions); and (iii) CFS never sold assets to any CFS affiliate. All of these statements were untrue and Bartmann knew or was reckless in not knowing of their falsity. In addition, Bartmann failed to disclose that CFS had been selling receivables on a monthly basis in order to prop up its collections to targeted levels and that the majority of these sales had been to an affiliated entity, Dimat, at inflated prices. Bartmann made further material misrepresentations of material facts to keep investors from discovering the fraudulent nature of the ECR model and the Asset Sales.

151.    Bartmann made these representations and omissions of material fact willfully and maliciously, with the intent to deceive and defraud investors, including Plaintiffs and Alliance, and knowing or acting in reckless disregard of their falsity.

152.    As described fully in the allegations above, Kathryn Bartmann's material misstatements and omissions were also willful as Kathryn Bartmann had access to the truth. Plaintiffs were injured by Kathryn Bartmann's willful and malicious behavior toward them which includes, among other things, Kathryn Bartmann, in the press and due diligence and marketing materials distributed to potential investors, misrepresented that CFS's ability to provide excellent returns for noteholders came from: (i) the hard work of CFS's personnel, (ii) CFS's supposedly sophisticated and thorough credit card receivable review, and (iii) organized, well-planned collection efforts. All of these representations were false.

- 44 -

153.    Kathryn Bartmann made these representations and omissions of material fact willfully and maliciously, with the intent to deceive and defraud investors, including Plaintiffs and Alliance, and knowing or acting in reckless disregard of their falsity.

154.    In reliance upon the misrepresentations by Bartmann and Kathryn Bartmann and in ignorance of the true facts, Plaintiffs, through their investment adviser, Alliance, were induced to and did purchase the CFS Securities.  Had the material misrepresentations and omissions not been made, Plaintiffs would not have invested in the CFS securities.

155.    As a direct and proximate result of this willful and malicious scheme to defraud, Plaintiffs have suffered damages, including purchasing the CFS Securities at a grossly inflated price, in a total amount to be determined at trial.

156.    Because the Debtors-Defendants Bartmann and Kathryn Bartmann willfully and maliciously injured the Plaintiffs, the claims of the Plaintiffs filed in this bankruptcy case should be determined to be excepted from discharge.

- 45 -

157.   **WHEREFORE**, the Plaintiffs respectfully pray that the Court

enter an order declaring the claims of the Plaintiffs to be non-dischargeable pursuant to

11 U.S.C. §§ 523(a)(2)(A) and (6),and that the Court award the Plaintiffs interest on this

indebtedness, and reasonable attorney's fees and costs incurred in this adversary

proceeding, which sums should also be determined non-dischargeable debts of

Defendants Bartmann and Kathryn Bartmann.

Dated: December 15, 2003

                                        *Kenneth I. Schacter  by CWEnglish*
                                        Kenneth I. Schacter
                                        Bonnie J. Host
                                        BINGHAM McCUTCHEN LLP
                                        399 Park Avenue
                                        New York, New York 10022
                                        (212) 705-7000

                                                    and


                                        *Carol Wood English*
                                        Carol Wood English , OBA No. 10532
                                        BOESCH McDERMOTT LLP
                                        100 West Fifth Street, Suite 800
                                        Tulsa, Oklahoma  74103-4216
                                        (918) 583-1777

                                        ATTORNEYS FOR MPF LIMITED,
                                        PEGASUS TWO LIMITED, PEGASUS
                                        THREE LIMITED, PEGASUS FOUR
                                        LIMITED, IOWA STATE
                                        UNIVERSITY FOUNDATION,
                                        ALLIANCE CAPITAL
                                        (LUXEMBOURG) S.A., MANSURII
                                        DORIIMU, and MANSURII DORIIMU
                                        II

- 46 -

B 104
(Rev. 2/92)

**ADVERSARY PROCEEDING COVER SHEET**
(Instructions on Reverse)

ADVERSARY PROCEEDING NUMBER
(Court Use Only)

**03-0248-R**

| PLAINTIFFS | DEFENDANTS |
|---|---|
| BARTMANN, WILLIAM R. and BARTMANN, KATHRYN A. Debtors. MPF LIMITED, PEGASUS TWO LIMITED, PEGASUS THREE LIMITED, PEGASUS THREE LIMITED, IOWA STATE UNIVERSITY FOUNDATION, ALLIANCE CAPITAL (LUXEMBOURGE) S.A., MANSURII DORIIMU II | WILLIAM R. BARTMANN and KATHRYN A. BARTMANN |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Kenneth Schacter    Carol Wood English Bingham Dana LLP    Boesche McDermott LLP 399 Park Avenue    100 West Fifth Street, Ste. 800 New York, NY (212)705-7000  Tulsa, OK  74103 (918) 583-1777 | |

PARTY (Check one box only)   ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ☐ 3 U.S. NOT A PARTY

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint to determine debts to Plaintiffs arising from events which are the subject of the CFS-Related Securities Fraud Litigation, pending as Case No. 99-CV-0829-K-(J), N.D. OK, to be non-dischargeable under 11 U.S.C. Sections 523 (a)(2)(a) and 523(a)(b).

**NATURE OF SUIT**
(Check the one most appropriate box only.)

| | | |
|---|---|---|
| ☐ 454 To Recover Money or Property | ☐ 455 To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan | ☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action |
| ☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property | ☒ 426 To determine the dischargeability of a debt 11 U.S.C. § 523 | |
| ☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property | ☐ 434 To obtain an injunction or other equitable relief | ☐ 459 To determine a claim or cause of action removed to a bankruptcy court |
| ☐ 424 To object or to revoke a discharge 11 U.S.C. § 727 | ☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan | ☐ 498 Other (specify) |

| ORIGIN OF PROCEEDINGS (Check one box only.) | ☐ 1 Original Proceeding | ☐ 2 Removed Proceeding | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another Bankruptcy Court | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |
|---|---|---|---|---|---|

| DEMAND $ 90 million | OTHER RELIEF SOUGHT | ☐ JURY DEMAND Check only if demanded in complaint |
|---|---|---|

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR William R. Bartmann and Kathryn A. Bartmann | BANKRUPTCY CASE NO. 03-04975-R |
|---|---|

| DISTRICT IN WHICH CASE IS PENDING Northern District of Oklahoma | DIVISIONAL OFFICE | NAME OF JUDGE Dana L. Rasure |
|---|---|---|

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT William R. Bartmann and Kathryn A. Bartmann | ADVERSARY PROCEEDING NO. |
|---|---|---|

| DISTRICT Northern District of Oklahoma | DIVISIONAL OFFICE | NAME OF JUDGE Dana L. Rasure |
|---|---|---|

| FILING FEE (Check one box only.) | ☒ FEE ATTACHED | ☐ FEE NOT REQUIRED | ☐ FEE IS DEFERRED |
|---|---|---|---|

| DATE December 15, 2003 | PRINT NAME Carol Wood English, OBA 10532 | SIGNATURE OF ATTORNEY (OR PLAINTIFF) Carol Wood English |
|---|---|---|